**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

Carlos Devon Lewis,
Petitioner
-vs-
Teresa Schroder, *et al.*,
Respondents.

CV-13-2339-PHX-NVW (JFM)

**Report & Recommendation
on Petition for Writ of Habeas Corpus**

## I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison Complex at Tucson, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 14, 2013 (Doc. 1).  On February 24, 2014, Respondents filed their Response ("Limited Answer") (Doc. 11) arguing *inter alia* the statute of limitations and procedural default.   Petitioner filed a Reply on April 7, 2014 (Doc.  14).  Pursuant to orders for supplemental briefing, etc., on May 22, 2014 Petitioner filed a Supplemental Reply re Prison Mailbox Rule (Doc. 22), on June 19, 2014 Respondents filed a Notice with a Response from trial counsel (Doc. 26), on July 15, 2014 Respondents filed a Supplemental Answer (Doc. 30), and on August 1, 2014 Petitioner filed a (second) Supplemental Reply (Doc. 31.)

The Petitioner's Petition is now ripe for consideration.   Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

/ /

/ /

1

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

In disposing of Petitioner's direct appeal, the Arizona Court of Appeals summarized the evidence at trial as follows:

> On July 28, 2009, the victim parked his 1995 Neon at his girlfriend's house at about 1:30 to 2:00 A.M. Approximately thirty to forty-five minutes later, the victim heard his car start-up, looked out the window, and saw that his car lights were on. After seeing his car driven away, the victim and his girlfriend proceeded to report the stolen vehicle to the police. The police arrived a few minutes later and the victim gave them a description of his car: a red, four-door Dodge Neon.
>
> Officer S. and Officer A. were on duty that night and patrolling in a law enforcement vehicle driven by Officer A. when Officer A. received a "hot call" describing the victim's vehicle. Officer A. drove westbound on Indian School Road and spotted the suspect vehicle coming southbound on 19th Avenue, turning right (westbound) onto Indian School Road. From the passenger seat, Officer S. was able to see the suspect's face in the side-view and rear-view mirrors of the suspect vehicle. He described the suspect as a "dark skinned male with kind of dreadlock hair tied back . [and] a dark goatee." Officer A. also had a clear view of the suspect when the patrol car was only a few feet from the suspect vehicle. He confirmed Officer S.'s description of the suspect.  Two other patrol cars soon joined in the pursuit.
>
> Officer A. activated the overhead emergency lights, siren, and "spotlight" in an attempt to stop the suspect vehicle. However, the suspect made eye contact with the officers and accelerated to 50-60 mph. Soon after, the officers saw sparks flying beneath the suspect vehicle before it went airborne and crashed through a fence at Washington High School. Then, the suspect got out of the vehicle and ran onto the school grounds. Officer A. stated the suspect was wearing a white tee-shirt, jean shorts, and white and red gym shoes.
>
> Shortly after Officer A. set up a perimeter around the high school, a canine-unit arrived to find the suspect. The canine led the police to Lewis, who emerged from beneath a vehicle parked on the school grounds and appeared to be sweating. Lewis was then handcuffed and taken into custody.
>
> Officer A. testified he was "100 percent" sure that Lewis was the same person he had seen driving the car. Officer S. also testified he was "100 percent" sure that Lewis was the same individual who fled from the vehicle.
>
> Officer S. proceeded to search the vehicle and found that the ignition had been "punched." The plastic casing around the ignition had been "stripped off" so a screwdriver or piece of metal could now be used to start the car. Subsequently, the police notified the victim that his car had been found, drove him to Washington High School, and showed him Lewis. The victim testified that he did not know Lewis and did not give permission to anyone with that name to take his car. In addition, the vice principal of Washington High School also testified he did not know Lewis and that Lewis did not

2

have permission to be on the school property.

(Exhibit G, Mem. Dec. at 2-4.)  (Exhibits to the Answer, Doc. 11, are referenced herein as "Exhibit ___.")

## B. PROCEEDINGS AT TRIAL

Petitioner was indicted in Maricopa County Superior Court on charges of the automobile theft, unlawful flight, and criminal damage.  (Exhibit A, Indictment.)  The state filed allegations of three historical priors.  (Exhibit B, Allegations.)

Petitioner proceeded to a jury trial, testifying in his own behalf, denied stealing the car, and claimed to have climbed the school fence to get away from his girlfriend, and was hiding because he thought someone had reported him for climbing the fence. (Exhibit A, Mem. Dec. at 4-5.)  He was found guilty as charged, admitted the priors, and was sentenced on July 2, 2010 to concurrent terms of 11.25, 5, and 3.75 years on the theft, flight, and damage charges.  (*Id.* at 5; Exhibit C, M.E. 6/4/10; Exhibit D, Sentence.)

## C.  PROCEEDINGS ON DIRECT APPEAL

Petitioner filed a Notice of Appeal (Exhibit E).  Counsel was appointed and filed an Opening Brief (Exhibit F) pursuant to *Anders v. California*, 386 U.S. 738 (1967) and related state authorities, asserting an inability to find appealable issues.  Petitioner was granted leave to file a supplemental brief but initially failed to do so.  The Arizona Court of Appeals reviewed the record for "reversible error," found none, and on June 14, 2011 affirmed Petitioner's convictions and sentences.  (Exhibit G, Mem. Dec.)

On June 27, 2011, Petitioner filed a Motion to Vacate (Exhibit H) seeking reconsideration of the appellate court's order, arguing he had sought an extension of time to file a supplemental brief, and had not known whether he had been granted an extension.   In his appended Supplemental Brief, Petitioner argued prosecutorial misconduct as a result of the reference in closing argument to Petitioner's "prior

3

conviction for interstate commerce of a stolen vehicle to secure a guilty verdict." (*Id.* at Supp. Brief at 2-3.)  He also argued the violation of equal protection and due process by the striking of a juror on the basis of race. (*Id.* at 3-4.)  Finally, he argued that the trial court had not determined that his "foreign" priors qualified as a felony in the state of Arizona.  (*Id.* at 5.)

The Arizona Court of Appeals construed the motion as one for reconsideration, noted that no motion to extend had been filed, but nonetheless "read and considered Appellant's Supplemental Brief" and found no issues to warrant vacating the Memorandum Decision, and on July 20, 2011 denied the motion.  (Exhibit I, Order 7/20/11.)

Petitioner did not seek further review.  (Petition, Doc, 1 at 3.)

## D.  PROCEEDINGS ON POST-CONVICTION RELIEF

**First PCR Proceeding** – Thereafter, Petitioner commenced his first post-conviction relief (PCR) proceeding by filing a Notice of Post-Conviction Relief (Exhibit J) on August 15, 2011.  The Notice was dated August 8, 2011.  (*Id.* at 3.)

The Office of the Public Defender was appointed (Exhibit K, M.E. 8/17/11), but filed a Motion to Withdraw (Exhibit L) based upon the potential of a claim of ineffective assistance of counsel.  The motion was granted, and new counsel appointed.  (Exhibit M, M.E. 10/12/11.

Counsel filed a "Notice of Completion of Review" (Exhibit N) evidencing an inability to find an issue for review.  Petitioner was granted leave to file a *pro per* petition, and counsel was directed to remain in an advisory capacity. (Exhibit O, M.E. 1/12/12.)

Petitioner then filed two motions to extend the time to file his supplemental brief. (Exhibits P, Q.)  The motions were granted, and Petitioner was given through May 27, 2012 to file his petition.  (Exhibit R, M.E. 4/27/12.)   He did not do so, and on June 29, 2012, the PCR court dismissed the proceeding.  (Exhibit S, M.E. 6/29/12.)

4

On July 9, 2012, Petitioner filed a Motion to Vacate, Notice of Post-Conviction Relief, and a *Pro Per* Petition (Exhibit T).  The Motion argued that his petition has been returned unfiled because prison officials had attached insufficient postage. The *Pro Per* Petition argued claims of: (1) improper refusal to give a lesser included offense instruction; (2) lack of probable cause to arrest; (3) and ineffective assistance of appellate counsel.

The Court granted the Motion to Vacate, accepted the *Pro Per* Petition, and directed a response. (Exhibit U, M.E. 7/31/12.)  After a Response (Exhibit V), the court concluded that the petition failed to "present any colorable claim for post-conviction relief," and in a Minute Entry dated October 21, 2012, but not filed until November 6, 2012, summarily denied the petition.  (Exhibit W, M.E. 10/31/12.)

Petitioner did not seek further review.  (Petition, Doc. 1 at 5.)

**Second PCR Proceeding** - Almost six months later, on April 15, 2013, Petitioner filed a "Notice of Abatement" (Exhibit X) and a "Notice and Demand for Abatement" (Exhibit Y) arguing a lack of subject matter jurisdiction due to defects in the grand jury proceedings and indictment.  Almost three months later, on July 21, 2013 he filed a Notice of Post-Conviction Relief (Exhibit Z).

On August 7, 2013, the PCR court construed the filings as a request for post-conviction relief, found it "initiated in an untimely manner," and summarily dismissed them.  (Exhibit AA, M.E. 8/7/13.)  This ruling was filed on August 19, 2013.

**Third PCR Proceeding** - Nonetheless, Petition filed his Petition for Post-Conviction Relief (Exhibit BB) on August 23, 2013.[1]  Then, on October 15, 2013, Petitioner filed a motion ("Notice") (Exhibit CC) seeking the status of his filings.  On November 12, 2013, the PCR court deemed this to be a new PCR proceeding[2] but found

---

[1] Petitioner designates this as his "Second Petition." (Petition, Doc. 1 at 4.)
[2] The PCR court denominated this as Petitioner's "fourth Rule 32 Proceeding." (Exhibit DD, M.E. 11/12/13 at 1.)  However, his prior proceeding has been denominated as his "second request for post-conviction relief." (Exhibit AA, M.E. 8/7/13 at 1.)  A review of the trial court's docket (Exhibit GG) reveals no intervening proceedings.  The undersigned concludes that the PCR court merely misspoke by referring to it as his "fourth" proceeding, rather than his "third."

5

the filing "both untimely and successive" and summarily dismissed it.   (Exhibit DD, M.E. 11/12/13 at 1.)

On December 16, 2013, Petitioner then filed a fourth PCR Petition (Exhibit EE), which the PCR court deemed to be a motion for reconsideration of the earlier denial, and denied the motion.  (Exhibit FF, M.E. 2/4/14.)


**E.  PRESENT FEDERAL HABEAS PROCEEDINGS**

**Petition** - Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 14, 2013 (Doc. 1).

Petitioner's Petition asserts the following four grounds for relief:

> In Ground One, Petitioner alleges that his due process rights were violated when neither he nor his counsel was given an opportunity to challenge the "grand jury array (composition selection process) and individual grand jurors prior to the grand jury being seated." In Ground Two, Petitioner alleges that his right to equal protection was violated when the prosecution used its peremptory challenges to remove the only African- American juror solely based on unemployment status when there were two other unemployed jurors not challenged. In Ground Three, Petitioner alleges that his due process rights were violated when the trial court "bypassed the priors hearing to see if [Petitioner's] federal priors qualif[ied] for enhancement purposes." In Ground Four, Petitioner alleges ineffective assistance of trial counsel, appellate counsel, and post-conviction counsel.

(Order 11/26/13, Doc. 4 at 3.)

**Response** - On February 24, 2014, Respondents filed their Response ("Limited Answer") (Doc. 11).  Respondents argue that the Petition is barred under the habeas statute of limitations, that Grounds One and Three are non-cognizable state law claims, and that Petitioner has failed to properly exhaust his state remedies, and has now procedurally defaulted on them.

**Reply** - On April 7, 2014 Petitioner filed a Reply (Doc. 14).  Petitioner argues he is entitled to equitable tolling for his second and third PCR petitions, as a result of prison lockdowns, and because some of his "legal transcripts, materials and petitions" were destroyed or misplaced in a riot.  (*Id.* at 2.)  He argues he was unrepresented by counsel,

was unable to obtain affidavits to support a claim of newly discovered evidence, and was unaware his state petitions were untimely. (*Id.*) He further argues he had been summoned to court on unrelated matters, resulting in a four month absence his prison unit and from his legal materials. (*Id.* at 3.) In the process, some of his legal materials were lost. (*Id.* at 4.) He further argues any procedural default was caused by the ineffective assistance of PCR counsel. He argues the merits of his claims, and that his innocence would have been shown by corroborating testimony from his girlfriend, conflicts between trial testimony and the transcripts of police reports and radio calls, and DNA testing of the car.

**Order for Supplements** – On May 1, 2014, the Court observed that the timeliness of the Petition appeared to depend upon the applicability of the prison mailbox rule to his August 15, 2011 Notice of Post-Conviction Relief (Exhibit J), and his habeas Petition (Doc. 1) Petitioner was directed to supplement the record to support any contention that the prison mailbox rule applied.

In addition, it was observed that Petitioner argued in his Reply (Doc. 14) that he was entitled to equitable tolling due to prison lockdowns and loss of legal materials in a prison riot. Respondents were given an opportunity to respond to those allegations.

Further, the Court observed that one claim of ineffective assistance of trial counsel concerning an uncalled witness, which was potentially under consideration in connection with a related assertion of cause and prejudice from PCR counsel's failure to raise the issue, had been rejected by respondents for failure to identify the witness or testimony. The Court observed that Petitioner had clarified in his Reply (Doc. 14) that it was the same witness raised in the state proceedings, Petitioner's girlfriend. Respondents were granted leave to supplement their Answer to address that claim.

Finally, the Court directed the parties to request a declaration from trial counsel on the asserted claims of ineffective assistance of counsel.

**First Supplemental Reply** – On May 22, 2014, Petitioner filed a Supplemental Reply (Doc. 22) arguing that he "delivered [his] petition for writ of habeas corpus to

prison officials for forwarding to the courts within the limitations period," but prison records fail to reflect anything sent to the Court in November or December of 2013.

In addition, Petitioner purports to "put this Court on notice that other claims of ineffective of PCR counsel for failing to raise trial counsel's failures in not presenting 911 recording, D.N.A. evidence and the striking of the only African American juror."

**Trial Counsel's Response** – On June 19, 2014, Respondents filed trial counsel Lewis's Response, addressing the allegations of his ineffectiveness (Doc. 26).

**Supplemental Answer** – On July 15, 2014, Respondents filed their Supplemental Answer (Doc. 30) arguing that Petitioner's first PCR Notice was mailed August 11, 2011, allowing one day of his one year to expire, and his habeas petition was delivered to prison officials for mailing on November 7, 2013, making his Petition delinquent. Respondents argue that the security lockdowns from the prison riots may have affected Petitioner's state filings, but did not keep Petitioner from pursuing his federal habeas. Respondents further argue that any brief lockdown in October, 2013, does not establish grounds for equitable tolling, and that any lack of access to Petitioner's legal papers in May through September, 2013 does not explain his failure to timely thereafter and despite that lack of access, Petitioner was able to file petitions in state court proceedings.

Respondents further argue that Petitioner has failed to show that he is actually innocent, but has proffered unsupported contentions of expected testimony from Mosley, which are contradicted by statements from trial counsel and are not reliable new evidence, and are overcome by the other evidence of guilt.

Respondents argue that Petitioner has failed to show cause to excuse his procedural defaults because trial counsel was not ineffective in failing to call Mosley to testify.

Finally, Respondents argue that trial counsel's response indicates that he provided reasonable representation to Petitioner.

**Supplemental Reply** - On August 1, 2014, Petitioner filed his (Second) Supplemental Reply (Doc. 31). Petitioner again argues he is entitled to equitable tolling

8

based on the January 2012 prison riot, and lack of access to legal resources from May to September of 2013 while he was in the Pima County Jail.    Although he filed state petitions in that time frame, he argues he did so with assistance from his appointed counsel in Pima County Superior Court, and he did not know at the time that his prior research for his habeas petition would become missing.  He asserts that he was instructed by a paralegal to get something filed, and he was scheduled to have his petition notarized, copied, and mailed the week of October 28, 2013 to October 30, 2013 but as a result of a prison lockdown he was unable to do so until the next day such services were available,  November 6, 2013.  Petitioner argues he was unaware that a "protective habeas petition" could have been filed.

Petitioner argues that he is entitled to avoid the effect of any untimeliness because Exhibit D to the Reply (a letter from the Justice Project) is available to show Mosley's testimony would establish his actual innocence, although her now faded recollection would make an affidavit unnecessary.  Petitioner further argues that the untested DNA and the un-presented 911 recording would have shown his innocence.

Petitioner argues that any procedural bar applied to his claims is not independent and adequate because the rules are unfair and did not provide a reasonable opportunity for Petitioner to have his federal claims heard.

Petitioner argues that trial counsel was ineffective in failing to investigate Mosley's testimony, despite counsel's assertions that Mosely had not been identified by name, and that Petitioner did not want Mosley to testify.  He further argues counsel was ineffective in failing to pursue the DNA evidence and 911 recording, to adequately impeach prosecution witnesses on inconsistencies between the police and victims' statements, to adequately research Petitioner's federal priors, to object to the use of Petitioner's statement, to challenge the denial of counsel at grand jury proceedings, and to refrain from harmful statements in closing.

/ /

/ /

### III. APPLICATION OF LAW TO FACTS

**A.  TIMELINESS**

**1.   One Year Limitations Period**

Respondents assert that Petitioner's Petition is untimely.  As part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress provided a 1-year statute of limitations for all applications for writs of habeas corpus filed pursuant to 28 U.S.C. § 2254, challenging convictions and sentences rendered by state courts.  28 U.S.C. § 2244(d).  Petitions filed beyond the one year limitations period are barred and must be dismissed.  *Id.*

**2.  Commencement of Limitations Period**

The one-year statute of limitations on habeas petitions generally begins to run on "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[3]

Here, Petitioner's direct appeal remained pending through July 20, 2011, when the Arizona Court of Appeals denied his motion for reconsideration.  (Exhibit I, Order 7/20/11.)  Thereafter, Petitioner had 15 days, or until Thursday, August 4, 2011, to file a petition for review by the Arizona Supreme Court.  Ariz. R. Crim. P. 31.19(a).

Moreover, Arizona has broadly applied its rule expanding time limits by five days after service by mail, Arizona Rule of Criminal Procedure 1.3(a), to include time limits running from the issuance of court orders.  *See e.g  State v. Rabun,* 162 Ariz. 261, 782 P.2d 737 (1989) (applying Rule 1.3(a) to Rule 31.3 deadline for notices of appeal); *State v. Savage*, 117 Ariz. 535, 573 P.2d 1388 (1978) (applying Rule 1.3(a) to Rule 32.9(c) deadline for petition for review from denial of motion for  rehearing in PCR proceeding); and *State v. Zuniga*, 163 Ariz. 105, 786 P.3d 956 (1990) (citing applying Rule 1.3 to time for notice of appeal delivered to attorneys' courthouse internal mailbox). Respondents

---

[3]  Later commencement times can result from a state created impediment, newly recognized constitutional rights, and newly discovered factual predicates for claims.  *See* 28 U.S.C. § 2244(d)(1)(B)-(D).  Petitioner proffers no argument that any of these apply.

concede that this further extended the deadline (Supp. Ans. Doc. 30 at 4-5, n. 1), and that Petitioner had through Tuesday, August 9, 2011 to seek review by the Arizona Supreme Court.

Petitioner did not do so, and his conviction became final no later than the expiration of such time, on Tuesday, August 9, 2011.[4]

Therefore, Petitioner's one year began running no later than August 10, 2011, and without any tolling expired on Thursday, August 9, 2012.

Petitioner's federal habeas Petition (Doc. 1) was filed on November 14, 2013. For purposes of determining the timeliness of the federal habeas petition, the federal "prison mailbox rule" applies. *Huizar v. Carey*, 273 F.3d 1220, 1223 (9th Cir. 2001). *See also* Rule 3(d), Rules Governing Section 2254 Cases. Under this rule, a prisoner's habeas filings are deemed "filed" when they are delivered to prison officials for mailing. *Id.* Prerequisites to application of the mailbox rule include: (1) that the petitioner is not represented by counsel; and (2) the petition is delivered to prison officials for forwarding to the courts within the limitations period. Delivery to prison officials for forwarding to an attorney or other intermediary does not qualify. *Stillman v. LaMarque*, 319 F.3d 1199 (9th Cir. 2003).

Respondents argue that Petitioner delivered for mailing his federal habeas petition to prison officials on November 7, 2013. (Supp. Ans., Doc. 30 at 5-6.) In support of this contention, Respondents provide an ADOC mail log showing such a mailing. (*Id.* at Exhibit B.) Petitioner proffers nothing to counter this beyond his unsupported and unexplained contention that he "delivered [his] petition for [a] writ of habeas corpus to prison officials for forwarding to the courts within the limitations period." (Second Supp. Reply, Doc. 22, at 1.) Indeed, the Petition itself belies an earlier date, inasmuch as Petitioner's signature is dated "11-7-2013." (Doc. 1 at 11.) Thus, the undersigned finds

---

[4] Respondents suggest without explanation that August 9, 2011 fell on a Sunday, and thus under Ariz. R. Crim. P. 1.3(a), the following Monday, "August 10, 2011," was the deadline. (Supp. Ans., Doc. 30 at 4-5, n.1.) The calendars consulted by the undersigned all reflect August 9, 2011 to have been a Tuesday.

that the Petition (Doc. 1) was delivered to prison officials for mailing on November 7, 2013, and that the Petition should be deemed filed as of that date.

Thus, without any tolling, Petitioner's November 7, 2013 habeas petition was almost 15 months delinquent.

### 3. Statutory Tolling

The AEDPA provides for tolling of the limitations period when a "properly filed application for State post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). This provision only applies to state proceedings, not to federal proceedings. *Duncan v. Walker*, 533 U.S. 167 (2001).

**Tolling from First PCR Proceeding** - Petitioner's limitations period commenced running on August 10, 2011. Petitioner's first PCR proceeding was commenced no later than August 15, 2011, when he filed his first PCR Notice (Exhibit J).

For purposes of calculating tolling under § 2244(d), the federal "prison mailbox rule" may apply. Under this rule, a prisoner's state filings are deemed "filed" when they are delivered to prison officials for mailing. *Anthony v. Cambra*, 236 F.3d 568, 575 (9th Cir. 2000). Although a state may direct that the prison mailbox rule does not apply to filings in its court, *see Orpiada v. McDaniel,* 750 F.3d 1086, 1090 (9th Cir. 2014), Arizona has applied the rule to a variety of its state proceedings, including notices of post-conviction relief. *State v. Rosario*, 195 Ariz. 264, 266, 987 P.2d 226, 228 (App.1999) (PCR notice). *See e.g. Mayer v. State,* 184 Ariz. 242, 245, 908 P.2d 56, 59 (App.1995) (notice of direct appeal); *State v. Goracke*, 210 Ariz. 20, 23, 106 P.3d 1035, 1038 (App. 2005) (petition for review to Arizona Supreme Court). Consequently, the undersigned concludes that the rule should apply to Petitioner's PCR notices.

Respondents argue (albeit hesitatingly) that Petitioner delivered his first PCR Notice to prison officials for mailing on August 11, 2011 (Supp. Ans., Doc. 30 at 5), and provide a copy of an ADOC mail log (*id.* at Exhibit A) to support the contention. Petitioner provides nothing to controvert it. Accordingly, the undersigned finds that

1   Petitioner delivered his first PCR notice to prison officials for mailing on that date, and
2   that his first PCR notice should be deemed filed as of that date.

3          Petitioner's one year had commenced to run on August 10, 2011.  Accordingly
4   when he "filed" his first PCR notice on August 11, 2011, one day of his limitations
5   period had expired, and he had 364 days remaining.

6          Petitioner's first PCR proceeding remained pending until the PCR court dismissed
7   the proceeding.  (Exhibit W, M.E. 10/31/12.)  It is true that the PCR court's Minute
8   Entry was dated October 31, 2012.  However, it was not filed until November 6, 2012.
9   Respondents consider the termination date to be the latter, November 6, 2012. (Supp.
10  Ans., Doc. 30 at 5.)  *See State v. Zuniga,* 163 Ariz. 105, 106, 786 P.2d 956, 957 (1990)
11  (time for appeal runs from mailing of order). Because it does not affect the outcome, the
12  undersigned presumes for purposes of this Report & Recommendation that the date of
13  filing controls, rather than the date of signing or other form of issuance.

14         Thus, Petitioner's habeas limitations period was arguably tolled from Thursday,
15  August 11, 2011 through Tuesday, November 6, 2012, just under 15 months.   It
16  commenced running thereafter, and expired 364 days later, on Tuesday, November 5,
17  2013, making his Petition, deemed filed as of November 7, 2013, at least two days
18  delinquent.

19         **Second and Third PCR Proceedings** – Petitioner's second and third PCR
20  proceedings were commenced on April 15, 2013 (Exhibit X) and August 23, 2013
21  (Exhibit BB).  However, the PCR court dismissed each of these as untimely.  (*See*
22  Exhibit AA, M.E. 8/7/13; and Exhibit DD, M.E. 11/12/13.)

23         In *Pace v. DiGuglielmo*, 544 U.S. 408 (2005) the Court held that when a state
24  post-conviction petition is untimely under state law, then it is not "properly filed" within
25  the meaning of § 2244(d)(2) for purposes of statutory tolling. Moreover, state court
26  alternative rulings, in addition to a ruling of untimeliness, do not make the petition
27  "properly filed." *Carey v. Saffold*, 536 U.S. 214, 225-26 (2002).

28         Accordingly, Petitioner is not entitled to any statutory tolling for the pendency of

his second and third PCR proceedings.

Consequently, Petitioner's habeas petition was at least two days delinquent.

**4. Equitable Tolling**

"Equitable tolling of the one-year limitations period in 28 U.S.C. § 2244 is available in our circuit, but only when 'extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time' and 'the extraordinary circumstances were the cause of his untimeliness.'"  *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir. 2003).

> To receive equitable tolling, [t]he petitioner must establish two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way. The petitioner must additionally show that the extraordinary circumstances were the cause of his untimeliness, and that the extraordinary circumstances ma[de] it impossible to file a petition on time.

*Ramirez v. Yates,* 571 F.3d 993, 997 (9th Cir. 2009) (internal citations and quotations omitted).  "Indeed, 'the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule.' " *Miranda v. Castro,* 292 F.3d 1063, 1066 (9th Cir. 2002)  (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.). Petitioner bears the burden of proof on the existence of cause for equitable tolling.  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006) ("Our precedent permits equitable tolling of the one-year statute of limitations on habeas petitions, but the petitioner bears the burden of showing that equitable tolling is appropriate.").

Petitioner argues he is entitled to equitable tolling for his second and third PCR petitions, as a result of prison lockdowns, and because some of his "legal transcripts, materials and petitions" were destroyed or misplaced in a riot, resulting in delays in submitting his 2nd and 3rd PCR petitions.  (Reply, Doc. 14 at 2-3.)   He argues he was unrepresented by counsel, was unable to obtain affidavits to support a claim of newly discovered evidence.   (*Id*.)   He further argues he had been summoned to court on

14

unrelated matters, resulting in a four month absence from his legal materials. (*Id.* at 3.) In the process, some of his legal materials were lost. (*Id.* at 4.)

***Pro Se* Status** - Petitioner argues that at the time he was preparing his second and third state PCR petitions, he was unrepresented by counsel, was unable to obtain affidavits to support a claim of newly discovered evidence, and was unaware his state petitions were untimely. (Reply, Doc. 14 at 2-3.)

Petitioner's *pro se* status and ignorance of the legal viability of his state petition is not cause for equitable tolling. "It is clear that *pro se* status, on its own, is not enough to warrant equitable tolling." *Roy v. Lampert*, 465 F.3d 964, 970 (9th Cir. 2006). A prisoner's "proceeding *pro se* is not a 'rare and exceptional' circumstance because it is typical of those bringing a § 2254 claim." *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000). *See also Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) ("a pro se petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling"). And, "ignorance of the law, even for an incarcerated *pro se* petitioner, generally does not excuse prompt filing." *Fisher v. Johnson*, 174 F.3d 710, 714 (5th Cir.1999).

Further, Petitioner makes no claim of newly discovered evidence in the instant Petition, thus any loss of an affidavit in support of such a claim would be irrelevant to his ability to file the instant petition.

Moreover, there was no requirement that such an affidavit be filed at the same time as the petition. It is true that a habeas petitioner ultimately bears the burden of proof in a habeas proceeding. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). However, that evidence need not be presented in the petition itself. *See* Rule 1, Rules Governing Section 2254 Cases. Rather, it could have been provided through a post-petition supplement to the record. *See* Rule 7, Rules Governing Section 2254 Cases. And, as noted above, the fact that Petitioner was *pro se* and ignorant of his ability to do so does not provide grounds for equitable tolling. In fact, Petitioner presented no such affidavit in the Petition he ultimately filed. (Doc. 1.)

**Loss of Materials From Riot** – Petitioner references the destruction of various materials in a prison riot in January, 2012.  (Second Supp. Reply, Doc, 31 at 3.)  Indeed, he argued such loss in his Second PCR Petition (Exhibit Z), in July, 2013, as justification for his delay in making that state filing.

However, he fails to show how that loss prevented him from a timely federal petition.  Petitioner proffers nothing to show that he acted diligently upon such loss to replace the lost documents.  Nor does he show which specific documents were lost, nor how they were necessary to the preparation of his federal habeas petition.  In *Waldron-Ramsey v. Pacholke*, 556 F.3d 1008, 1013-14 (9th Cir. 2009), the Ninth Circuit found no basis for equitable tolling founded upon lack of access to a petitioner's own files where he "does not point to specific instances where he needed a particular document" and "[i]f diligent he could have prepared a basic form habeas petition and filed it to satisfy the [habeas deadline]."  *But see Espinoza-Matthews v. California*, 432 F.3d 1021, 1027 (9th Cir. 2005) (finding grounds for equitable tolling where petitioner denied access to entire file).

Most significantly, Petitioner fails to show how a loss of documents occurring some ten months before his federal habeas limitations period even began to run made it impossible for him to make a timely federal filing.  With diligence, Petitioner should have been able to recover all of his records long before his one year even began to run.

At its heart, Petitioner's argument is not that the riot prevented a timely filing of his federal habeas petition, but a timely filing of his second and third state PCR proceedings.  But Petitioner failed to convince the state courts that the untimeliness of those state proceedings was excusable.  And, the fact that Petitioner made a poor tactical choice to pursue those untimely proceedings rather than filing a timely federal petition, is not a basis for a finding of equitable tolling. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (no equitable tolling where petitioner continued to pursue untimely state petition); and *Rasberry v. Garcia,* 448 F.3d 1150, 1154 (9th Cir. 2006) ("a *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting

1    equitable tolling").

2          Respondents assert that even if Petitioner was motivated by a desire to meet the

3    exhaustion requirement, he could have filed a "protective petition," asserting his claims

4    but seeking a stay to exhaust his state remedies.  Such a process was approved by the

5    Supreme Court in *Pace*:

6            Finally, petitioner challenges the fairness of our interpretation. He
     claims that a "petitioner trying in good faith to exhaust state
7    remedies may litigate in state court for years only to find out at the
     end that he was never 'properly filed,' " and thus that his federal
8    habeas petition is time barred. A prisoner seeking state
     postconviction relief might avoid this predicament, however, by
9    filing a "protective" petition in federal court and asking the federal
     court to stay and abey the federal habeas proceedings until state
10   remedies are exhausted. A petitioner's reasonable confusion about
     whether a state filing would be timely will ordinarily constitute
11   "good cause" for him to file in federal court.

12   *Pace*, 544 U.S. at 416 (citations omitted).  Petitioner protests that he was unaware he

13   could do such a thing.  However, "ignorance of the law, even for an incarcerated *pro se*

14   petitioner, generally does not excuse prompt filing." *Fisher v. Johnson*, 174 F.3d 710,

15   714 (5th Cir.1999).

16         **Absence from Prison** – Petitioner complains that he was removed from the

17   prison for four months to attend Pima County Superior Court, in May, 2013 through

18   September 2013, while his one year was running.  Petitioner contends that during this

19   time he had no access to legal research materials because he was being represented by

20   counsel in the other state proceedings.  However Petitioner fails to establish how this

21   delay precluded him from a timely filing.  Petitioner's one year did not expire until

22   November 5, 2013, leaving him over one month after his return to ADOC to complete

23   his federal petition.

24         Moreover, in the same time frame, Petitioner was able to make several significant

25   state filings.  On July 21, 2013 he filed his second Notice of Post-Conviction Relief

26   (Exhibit Z), and on August 23, 2013 he filed his Petition for Post-Conviction Relief

27   (Exhibit BB).  Petitioner contends that he was able to file these state court petitions

28   during this time period only because his counsel in the other matter was assisting him

with access to state court materials, but as a represented defendant he was denied access to the law library.  Petitioner does not suggest, however, what additional materials were necessary for him to complete his federal petition. This circuit has found that a lack of access to legal resources may be an extraordinary circumstance warranting equitable tolling. *See, e.g., Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000) (*en banc*) . However, in cases where courts have found that an extraordinary circumstance might exist, the petitioner always pointed to specific materials to which he did not have access. *See, e.g., Roy v. Lampert*, 465 F.3d 964, 974 (9th Cir. 2006) (finding that lack of access to AEDPA materials and Oregon law books may be an extraordinary circumstance); *Mendoza v. Carey*, 449 F.3d 1065 (9th Cir. 2006) (finding that lack of access to Spanish language legal materials or assistance could entitle habeas petitioner to equitable tolling).

Nor does Petitioner explain why the additional research materials were necessary. The approved form of habeas petition specifies that in stating a ground for relief, a Petitioner is only required to state the basic ground for relief and to state the supporting facts.  The form cautions: "Do not argue or cite law.  Just state the specific facts that support your claim."  (*See* Petition, Doc. 1 at 6, 7, 8, and 9.)   Rule 2(c) of the Rules Governing Section 2254 Cases specifies the requirements for a habeas petition, and clarifies that nothing more is required than the "ground for relief" and "the facts supporting each ground."   Indeed, Petitioner's present Petition is devoid of any expansive legal authorities or arguments.

Further, in light of the requirement that state remedies on claims be exhausted prior to presentation of the federal petition, it would not be appropriate or necessary for Petitioner to be researching new claims to be presented to the federal court.   Indeed, Petitioner's federal Petition asserts claims founded upon the composition of the grand jury, racially motivated preemptory challenges to jurors, improper reliance on priors to enhance sentence, and ineffective assistance of counsel.  (Order 11/26/13, Doc. 4 at 3.) And, in his Third Petition for Post-Conviction Relief (Exhibit BB), Petitioner argued the substance of his federal Ground 1 (denial of due process in the composition of the grand

jury), Ground 2 (preemptory challenges to jurors), Ground 3 (improper enhancement of sentence on priors), and Ground 4 (ineffective assistance).

**Materials Lost While Absent** – In his Reply, Petitioner argues that upon returning from county court to his prison unit, his habeas petition was missing from his property, and was not located.  (Reply, Doc. 14, Exhibit A, Declaration of Petitioner 3/26/14.)   In his Supplemental Reply, Petitioner references the last material as "the research I already conducted on my habeas."  (Doc. 31 at 4.)  The undersigned presumes these describe the same documents, and do not represent a change in Petitioner's account.  Petitioner fails to establish that the loss of these documents made it impossible for him to file on time.

Although Petitioner explicitly dates his departure to county court as May 21, 2013, he fails to indicate the date of his return.  The records of the Pima County Superior Court reflect a single prosecution against Carlos Lewis in 2013, Case CR-2013-1732, and show that he was sentenced in that case on September 6, 2013, with no further court proceedings thereafter.  *See*  http://www.agave.cosc.pima.gov/PublicDocs/, search for case "CR20131732", last accessed 10/9/14.   Respondents argue that Petitioner was returned by "mid-to-late September of 2013."  (Supp. Ans., Doc. 30 at 9.)   Petitioner does not counter this contention.  Assuming that it took two weeks for Petitioner to be returned to prison thereafter, he would have been back in his prison unit by September 20, 2014.  In any event, upon his return and discovery of the loss, Petitioner had over a month to complete his federal petition.

Even so, as noted by Respondents, Petitioner was free to continue preparing his federal petition during the three to four months he was away from the prison.  Petitioner points to nothing to suggest that he was obligated to abandon the project for the months he was away.  Perhaps, if Petitioner's habeas petition were extensive or complex, this loss might be said to have caused his delay.  However, the Petition is skeletal.  The substance of  Ground 1 is less than 13 lines of handwritten text.  Ground 2 is less than 12 lines.  Ground 3 is less than 20 lines. Ground 4, the most expansive, is less than 24 lines.

Moreover, such a loss of documents while Petitioner was away cannot be said to be an extraordinary circumstance.  As Petitioner describes it, the loss of stored property "is a[n] ongoing problem in the A.D.O.C. prison system and in most cases inmates got to take these matters as a loss."  (Reply, Doc. 14 at 4.)

**Lockdown** – Finally, Petitioner argues that he experienced a lockdown "[t]he week of October 28, 2013," and that "before the lockdown Petitioner was diligently pursuing to file his writ of habeas corpus."  (Reply, Doc. 14 at 3.)  Exhibit A(1) to his Reply is an Inmate Letter response indicating that the Cimmaron prison unit, where Petitioner was incarcerated when he filed his habeas petition, was "on restricted movement, October 29 and 30 of 2013."  Petitioner provides an affidavit from the prison unit paralegal that reflects that the affected date was "on or around October 28, 2013" and that "legal library access was not available to the inmate population."  (Reply, Doc. 14, Exhibit A(2).)  Petitioner also provides an affidavit from the prison librarian avowing that the lockdown occurred "on or around October 28, 2013," and as a result "legal library access," consisting of "para-legal assistance, copies, statutes and notaries" "wasn't available for the inmate population."  (Reply, Doc. 14, Exhibit A(3).)  Petitioner argues he was only permitted access on a weekly basis, and that the lockdown continued until November 6, 2013, and that November 7, 2013 (the day he mailed his Petition) was the first opportunity for him to have access to those services.  (2nd Supp. Reply, Doc. 31 at 5.)

Lockdown Was Not Extraordinary Circumstance - Respondents argue that "[l]ockdowns and limitations on access and movement are common aspects of prison life" and do not give rise to grounds for equitable tolling.  (Supp. Ans. Doc. 30 at 8.)

Indeed, periodic disruptions in prison life such as lockdowns are not the types of extraordinary circumstances which would ordinarily justify equitable tolling.  They are the routine ebb and flow of daily life in prison, akin to traffic jams, computer failures, and bad weather for those outside of prison.  A litigant is not entitled to an expansion of the limitations period for every day in which they were not perfectly situated to pursue

their filing. A contrary conclusion would, in the words of the *Ramirez* decision, "permit the exception to swallow the rule."  571 F.3d at 998.

"As a general matter, it is difficult to show that prison lockdowns and restricted access to the law library present extraordinary circumstances that justify equitable tolling." *U.S. v. Garcia-Guia*, 2013 WL 5329232, 2 (S.D.Ohio 2013).  Still, that does not mean, of course, that the vagaries of prison life can never justify equitable tolling.  For example, in *Espinoza-Matthews v. California*, 432 F.3d 1021 (9th Cir. 2005), the court found grounds for equitable tolling where as a result of various prison restrictions "[f]or nearly 11 months, despite his diligence, Espinoza-Matthews could not obtain his legal papers," and ultimately "had only slightly over a month with his legal file to try to prepare a proper petition."  And, in *Lott v. Mueller*, 304 F.3d 918 (9th Cir. 2002), the court found a basis for equitable tolling based, in part, on the fact that the petitioner "was denied access to his files during two temporary transfers that lasted eighty-two days." *Id.* at 924.  Here, the lockdown experienced by Petitioner was not an extended affair.  Rather, it only continued for a few days.  And, Petitioner had the vast majority of the prior year to work on his federal petition.

Moreover, Petitioner offers nothing to suggest that the lockdown was unforeseeable (although, perhaps unpredictable), rather than a common element of prison life. "Brief security lockdowns, however, could hardly be characterized as an 'extraordinary circumstance.'"  *U.S. v. Van Poyck*, 980 F.Supp. 1108, 1111 (C.D.Cal. 1997).  *See also Jackson v. Runnels*, 2008 WL 936791, 24 (C.D.Cal. 2008) ("lockdowns and restrictions on law library access are an ordinary incident of prison life, and do not generally qualify as an 'extraordinary circumstance' sufficient to equitably toll the statute of limitations for federal habeas petitions"); *Atkins v. Harris*, 1999 WL 13719, 2 (N.D.Cal. 1999) ("Prisoners familiar with the routine restrictions of prison life must take such matters into account when calculating when to file a federal petition.")

Diligence Not Shown - Moreover, Petitioner proffers nothing to establish that he had been diligent in preparing his petition prior to the lockdown.  At best, Petitioner

21

makes the bald assertion that he was "diligently pursuing to file his habeas claim before being summoned to court in May." (2nd Supp. Reply, Doc. 31 at 4.)

Petitioner points to *Sosssa v. Diaz*, 729 F.3d 1225 (9th Cir. 2013), where the petitioner alleged that as a result of lockdowns and limited access policies, he was denied access to "the prison's law library and other resources" during the bulk of the three months permitted for him to file an amended petition.[5] *Id.* at 1235. (*See* 2nd Supp. Reply, Doc. 31 at 4.) The Ninth Circuit concluded that, if proven, the petitioner's allegations would justify equitable tolling. There, however, the petitioner diligently sought to obtain the required access throughout the running of the available time, was permitted only one day of access, two days before his amended petition was due, and the copier malfunctioned on that day. In contrast, here, Petitioner had had an entire year to prepare his habeas petition, and the lockdown did not consume the majority of the available time, nor even a significant portion, but merely the last moments.

Petitioner correctly argues that the lockdown "came at an unfortunate time." (2nd Supp. Reply, Doc. 31 at 5.) However, that does not render the lockdown an extraordinary circumstance nor establish Petitioner's diligence. Indeed, Petitioner alleges that it took two weeks to schedule a library visit. Consequently, when Petitioner scheduled himself to finalize and submit his petition on October 30, 2013, it was his last possible opportunity to timely file his petition. Petitioner was in no different shoes than an attorney who waits until late in the day. to leave for the courthouse and finds himself mired in traffic, arriving too late to make a timely filing. "The fact that plaintiff's attorney and his legal assistant were caught in 'extremely heavy' traffic on [their way to file a complaint on the last day] is not a circumstance beyond the plaintiff's control." *White v. City of Chicago*, 1996 WL 648710, 3 (N.D.Ill.,1996). *Cf. O'Malley v. Town of Egremont*, 453 F.Supp.2d 240 (D.Mass. 2006) (no excusable neglect where attorney attempting to file on last day was delayed on way to courthouse by extreme weather).

---

[5] The Ninth Circuit had concluded that the petitioner was entitled to rely upon a deadline set by the district court for an amended petition, even though the limitations period expired in the interim.

Such circumstances are foreseeable, are not extraordinary, and a diligent litigant acts to avoid the risk of such foreseeable circumstances.

<u>Conclusion re Lockdown</u> - In sum, Petitioner fails to meet his burden of showing that he had been pursuing his rights diligently, and fails to show that the eleventh hour lockdown was an extraordinary circumstance.  Accordingly, Petitioner is not entitled to any equitable tolling.

**Conclusion re Equitable Tolling** – Considered separately, none of the circumstances recited by Petitioner justify equitable tolling.  Taken together, they paint a series of events that, while unfortunate and perhaps even explaining Petitioner's delay, do not establish any extraordinary circumstances, nor has Petitioner shown that those circumstances rendered it impossible for him to file a timely federal habeas petition.  Accordingly, the undersigned concludes that Petitioner has failed to meet his burden of showing grounds for equitable tolling.

**5.  Actual Innocence**

To avoid a miscarriage of justice, the habeas statute of limitations in 28 U.S.C. § 2244(d)(1) does not preclude "a court from entertaining an untimely first federal habeas petition raising a convincing claim of actual innocence."  *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1935 (2013).   To invoke this exception to the statute of limitations, a petitioner "'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Id.* at 1935 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  This exception, referred to as the "*Schlup* gateway," applies "only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.' " *Id.*  at 1936 (quoting *Schlup*, 513 U.S. at 316).

In his Reply, Petitioner argues that he has new evidence to show he actual innocence, but does not identify it explicitly.  (Reply, Doc. 14 at 4-5.)  In his assertions

23

1  of ineffective of assistance of PCR counsel as cause to excuse his procedural defaults, he

2  identifies corroborating testimony from his girlfriend, conflicts between trial testimony

3  and the transcripts of police dispatch calls, and DNA testing of the car. (*Id.* at 5, *et seq.*)

4  In his Second Supplemental Reply, Petitioner argues that Exhibit D to the Reply

5  (a letter from the Justice Project) is available to show his girlfriend's testimony would

6  establish his actual innocence, although her now faded recollection would make an

7  affidavit unnecessary.   Petitioner further argues that the untested DNA and the un-

8  presented 911 dispatch recording would have shown his innocence. (2nd Supp. Reply,

9  Doc. 31 at 6-7.)

10  Respondents argue that Petitioner has failed to show that he is actually innocent,

11  but has proffered unsupported contentions of expected testimony from Mosley, which

12  are contradicted by statements from trial counsel and are not reliable new evidence, and

13  are overcome by the other evidence of guilt.  (Supp. Ans. Doc. 30 at 12-14).

14  At the outset, the undersigned notes that much of Petitioner's arguments

15  concerning these matters is intertwined with his allegations of ineffective assistance of

16  counsel.  However, claims of ineffectiveness may be sustained simply by showing that

17  omitted evidence had a reasonable probability of altering the outcome at trial, e.g. by

18  precluding the state from meeting its burden of showing guilt. *See Strickland v.*

19  *Washington*, 466 U.S. 668, 694 (1984).  In contrast, Petitioner's burden under *Schlup* is

20  to show that the omitted evidence affirmatively establishes his actual innocence.  *See*

21  *Carriger v. Stewar*t, 132 F.3d 463, 486, n.1 (9th Cir. 1997) (Kozinski, C.J., dissenting)

22  (comparing the standards under *Strickland* and *Schlup*).

23  **Girlfriend's Expected Testimony** – Petitioner asserts that his girlfriend, Shanae

24  Mosley, his "baby mama", would provide him an alibi. (Reply, Doc. 14 at 8.) Petitioner

25  proffers nothing to support that contention.  At best, Petitioner points to a letter from the

26  Justice Project, which suggests that "Chene" Mosley would have provided "helpful

27  information about the night of July 27-28 of 2009."  However, as argued by Respondents

28  (Supp. Ans., Doc. 30 at 12), that same letter concluded that "because she could not

24

account for your whereabouts from 2:00 a.m. until 4:00 a.m., and the car was stolen about 2:30 a.m., Chene's testimony would not likely meet the 'clear and convincing' standard for an actual innocence claim."  (Reply, Doc. 14, Exhibit D, Letter 8/6/12.) Petitioner does not counter that observation, and leaves this Court to speculate how Mosley's testimony would establish his innocence.

Moreover, *Schlup* requires a showing founded upon "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Schlup*, 513 U.S. at 324.  Petitioner proffers nothing to suggest that Mosley is trustworthy.  Her lack of trustworthiness is suggested by several things.  First is the familial relationship between them, given their common child. Second, trial counsel's Response to this Court reflects that Petitioner did not wish to have her testify at trial and that she was not "an alibi at the time of the car being stolen and the ensuing chase." (Response, Doc. 26, Exhibit B at 2-3.)  Petitioner proffers nothing to counter those assertions.   Finally, Petitioner himself admits that Mosley's memory is now faded.

**DNA Evidence** – Petitioner contends that DNA evidence would establish his innocence.  However, Petitioner fails to proffer anything to show that any such evidence exists.

At best, Petitioner argues that the stolen vehicle was swabbed for DNA (*see* Exhibit T, PCR Petition, Added Memorandum at 3),[6] and asks this Court to assume that the DNA that was collected, if tested, would not be his.  Petitioner proffers nothing to support such an assumption.

Even assuming the DNA was not Petitioner's, that would not establish Petitioner's actual innocence.  Indeed, the persuasive effect of such information would be almost non-existent.  For example, there is no suggestion that only one person's DNA

---

[6] Petitioner provides what he purports to be a Phoenix Police Department Report reflecting that "biological evidence" samples were taken from the steering wheel, rearview mirror and damaged steering column of the stolen vehicle.  (Reply, Doc. 14 at Exhibit C.)

could be found in the vehicle in the way that, for example the DNA collected in a rape case might. *See e.g.District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009) (DNA testing of sperm left in condom at remote scene of rape). Or, for example, Petitioner does not suggest that there was another suspect found in the vicinity of the stolen car, who would be further implicated if their DNA were found inside. The most that would be established by such evidence would be that someone other than Petitioner had, at some point in time, been in the vehicle. That neither precludes nor even raises a substantial question as to Petitioner's guilt. "Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent." *Osborne*, 557 at 62.

**Radio Transcripts** – Petitioner argues that the "911 dispatch recording" would have shown that "Officer S. and Officer A. were in fact unsure whom the suspect was." Petitioner argues:

> 25 minutes into their search, officers put a description of a stocky build black shirt tapered hair cut. Than [sic] after I was in custody officer Sund continuously questioned me about some person I didn't know about and Officers continued on with their search for about 1hr:45min while I was, again, already in custody which show [sic] Officer S. and Officer A. couldn't possibly [be] 100% sure as they claimed.

(Reply, Doc. 14 at 12 (citations omitted.) Liberally construed, the undersigned finds this to assert that Petitioner's guilt was called into question by the fact that the officers originally provided a description which did not match Petitioner, and continued searching the area for another suspect after Petitioner was taken into custody.

However, the description referenced by Petitioner came from the victim, not the officers. The radio report includes the entry "SUSP VICT SAW WEARING BLK SHI TAPERED HAIR CUT BROAD…SHOULDER OR HUSKY BUILD." (Reply, Doc. 14, Exhibit H at Time 040027 and 040041.) Indeed, the victim testified that he told the officers he thought the thief "might" be wearing a black shirt. (Exhibit LL, R.T. 6/2/10 at 40, 42.) And, Officer Campbell testified that the original description of the suspect was "stocky with a black shirt on." (Exhibit MM, R.T. 6/3/10 at 67. *See also id.* at 80

("black shirt").)   He expounded:

> Q    …Did the victim see the person who took his car?
> A    He saw an individual inside the vehicle.
> Q    Did he give you a description?
> A    He did.  He gave me a stocky black male with a cropped haircut.  He did say to me, though, he wouldn't be able to 100 percent positively identify the suspect because it was dark still, and I believe the - - I believe the vehicle had tinted windows.

(*Id.* at  76.)   That the victim's description of who he saw initially taking the vehicle did not match what the officers saw and what Petitioner's appearance was upon arrest, would not preclude the credibility of the officers.   The victim's description was admittedly tentative, and nothing precluded the potential that Petitioner had an accomplice who initially took the vehicle.

Further, there was nothing exculpatory about the continued search.   Officer Campbell testified that they continued the search because "there might have been two people in the vehicle, as was reported over the police radio."  (Exhibit MM, R.T. 6/3/10 at 91.  *See also id.* at 95, 97.)   The failure of the officers to complete the search of the school yard would have left open the possibility that the thief was still hiding and Petitioner was innocent. Moreover, the conflict between the victim's halting description and Petitioner's appearance called for a continued search.   Thus it is not surprising that the officers continued to search.    Indeed, the fact that no one else was found tends to show that Petitioner was the thief.

In any event, neither purported discrepancy establishes Petitioner's actual innocence.   At best, it was fodder for cross-examination of the officers, and weak fodder at that. Both officers described seeing the Petitioner in the stolen vehicle while they were following him, and seeing Petitioner run from the stolen vehicle after they came to a stop near it. Other officers testified that despite continuing the search with the tracking dog, Petitioner was the only person found in the school grounds. That evidence, coupled with Petitioner's unsupported and implausible explanation for his hiding under a vehicle in a locked school yard in the middle of the night (*i.e.* that he was running from his girlfriend), leaves no room for a finding of  "evidence of innocence so strong that a court

1  cannot have confidence in the outcome of the trial." *McQuiggin*, 133 S.Ct. at 1936.

2

3  **6.  Summary re Statute of Limitations**

4        Petitioner's one year habeas limitations period commenced running on August 10,

5  2011, ran for one day, was statutorily tolled from August 11, 2011 until November 6,

6  2012, began running again on November 7, 2012 for 364 day, until November 6, 2013,

7  making his November 7, 2013 habeas petition one day delinquent.  Petitioner has failed

8  to establish a basis for additional statutory tolling, and no basis for equitable tolling or

9  actual innocence to avoid the effects of his delay.  Consequently, the Petition is untimely

10  and must be dismissed with prejudice.

11

12  **B.  OTHER DEFENSES**

13        Respondents also argue that Petitioner's state remedies on his claims were

14  procedurally defaulted or disposed of on independent and adequate state grounds, and

15  thus are barred from federal habeas review, and that Grounds 1 and 3 fail to adequately

16  assert federal claims.  The undersigned does not reach these defenses for the following

17  reasons: (1) the petition is plainly barred by the habeas statute of limitations, if only by

18  one day; (2) the Court has already determined in its service Order that Grounds 1 and 3

19  make out claims of due process violations (Order 11/26/13, Doc. 4 at 3); and (3) at least

20  some of Petitioner's claims were arguably presented to the Arizona Court of Appeals in

21  the Supplemental Brief filed with Petitioner's Motion for Reconsideration (Exhibit H),

22  and rejected on the merits (Exhibit I, Order 7/20/11).

23

24  **IV.  CERTIFICATE OF APPEALABILITY**

25      **Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires

26  that in habeas cases the "district court must issue or deny a certificate of appealability

27  when it enters a final order adverse to the applicant."  Such certificates are required in

28  cases concerning detention arising "out of process issued by a State court", or in a

proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be on procedural grounds. Under the reasoning set forth herein, jurists of reason would not find it debatable whether the district court was correct in its procedural ruling.

Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.


## V.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of Habeas Corpus, filed November 14, 2013 (Doc. 1) be **DISMISSED WITH**

1   PREJUDICE.

2          **IT IS FURTHER RECOMMENDED** that, to the extent the foregoing findings

3   and recommendations are adopted in the District Court's order, a Certificate of

4   Appealability be **DENIED**.

5

6                    **VI. EFFECT OF RECOMMENDATION**

7          This recommendation is not an order that is immediately appealable to the Ninth

8   Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules*

9   *of Appellate Procedure*, should not be filed until entry of the district court's judgment.

10          However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties

11  shall have fourteen (14) days from the date of service of a copy of this recommendation

12  within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules

13  Governing Section 2254 Proceedings.   Thereafter, the parties have fourteen (14) days

14  within which to file a response to the objections.  Failure to timely file objections to any

15  findings or recommendations of the Magistrate Judge will be considered a waiver of a

16  party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*,

17  328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's

18  right to appellate review of the findings of fact in an order or judgment entered pursuant

19  to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-

20  47 (9th Cir. 2007).

21

    Dated: October 14, 2014

22  
    13-2339r RR 14 04 29 on HC FINAL.docx

23                                                    James F. Metcalf
                                                United States Magistrate Judge

24

25

26

27

28